UNITED STATES of America, by Ramsey CLARK, Acting Attorney General, Plaintiff,

v.

DILLON SUPPLY COMPANY, a corporation, Defendant.

Civ. A. No. 1972.

United States District Court,
E. D. North Carolina,
Raleigh Division.

July 2, 1969.

Francis H. Kennedy, Jr., Alexander C. Ross, Richard W. Bourne, Civil Rights Division, Dept. of Justice, Washington, D.C., for plaintiff.

Charles H. Young, Young Moore & Henderson, Raleigh, N.C., for defendant.

## MEMORANDUM ORDER

KELLAM, District Judge.

The complaint in this action was filed February 27, 1967. On March 17, 1967, defendant filed a motion to strike and a motion for a more definite statement. On April 10, 1967, plaintiff filed its memorandum in opposition to said motions. On April 21, 1967, counsel were directed to appear on May 4, 1967, for argument on said motions, and notified the case was calendared for trial on a day certain during the week of May 22, 1967. At the hearing on May 4, 1967, the motions to strike and for a more definite statement were denied, and defendants ordered to answer within 30 days. Defendant filed its answer May 31, 1967.

By order of February 19, 1968, filed February 20, 1968, counsel were notified by Judge Robert W. Hemphill, sitting by designation, that a pre-trial conference would be held in this case April 9, 1968, which directed counsel to confer and produce at the conference a written stipulation of (1) issues, (2) all uncontested facts, (3) names and addresses of all expert or qualified witnesses and their undisputed qualifications, (4) a list of all witnesses, (5) all exhibits, (6) the authority or admissibility of exhibits, with objections, etc. This order further provided that "[S]ince it is anticipated that all discovery has been completed, counsel will justify any failure to complete and/or any necessity of further time for

discovery." On March 7, 1967, Judge Hemphill wrote defendant's counsel with copy to plaintiff's counsel, "discovery time should only be continued for *cause*." [Italics by Judge Hemphill].

At the pre-trial conference of April 9, 1968, plaintiff filed a list of witnesses containing 24 names. By order of that date Judge Hemphill granted plaintiff and defendant an additional 30 days for taking discovery. Counsel were further directed within 15 days from date of completion of discovery to (1) "meet, confer, and provide the information directed in the pre-trial order filed February 20, 1968," and (2) "counsel will be noticed by opposite counsel of any statistician supposed to be called as a witness" giving information about his qualifications, etc.

On June 10, 1968, defendant's counsel wrote plaintiff's counsel calling attention to Judge Hemphill's order of April 9, 1968, and to the fact that at the attorneys' conference of May 24, 1968, held pursuant to direction of the Court's order (1) plaintiff had not furnished copy of its exhibits or listed a statistician who might be called as a witness; (2) that the stipulations agreed upon which had been written and forwarded on May 28, 1968, to plaintiff's counsel for signature had not been returned; (3) that the plaintiff had failed to furnish a witness list; and (4) plaintiff's counsel were advised that objection would be made to the use of any exhibit which had not been previously submitted. Subsequent thereto the stipulation previously agreed to was revised by plaintiff's counsel and returned by letter of June 14, 1968. By letter of June 18th, defendant's counsel protested saying that if the stipulation was to be changed, it should be done in a conference between all counsel, and suggested the parties "meet as promptly as possible."

The file reflects no further action until the entry of the order of December 9, 1968, scheduling a pretrial conference on January 29, 1969.[1] This order provided that if time for taking discovery had not expired, time for discovery would terminate within 45 days from that date, and that counsel should confer at least ten days prior to the date of the pre-trial conference and: (a) stipulate all facts and issues not in dispute, (b) stipulate all exhibits to be offered in evidence, which were to be presented at the pre-trial conference, (c) list all witnesses, with a statement of whether an eye-witness, etc., and (d) agree on a statement of contentions of each party, the issues, etc. Plaintiff's counsel was required to prepare the pre-trial order incorporating all such matters, and other matters called for in the order, and submit it to the Court at the pre-trial conference.

Counsel appeared at the conference but plaintiff's counsel did not present the pre-trial order. Chief Judge Walter E. Hoffman, who conducted the conference, was unable to obtain any reasonable explanation for such failure, and directed counsel not to leave Raleigh, North Carolina, until a pre-trial order had been prepared. At the end of the following day, counsel advised the Court they had been in conference the entire day and there was prospect of agreeing upon a disposition of the case without further proceedings, whereupon the Court re-scheduled a pre-trial conference at Norfolk, Virginia, for February 20, 1969. On date of February 7, 1969, plaintiff's counsel advised it would not agree to a disposition of the action.

On February 11, 1969, plaintiff's counsel forwarded to Judge Hoffman a motion (1) for a limited discovery period, and (2) to change the place of holding trial.[2] Plaintiff's letter of transmittal stated that "a disposition of the mat-

---

1. This is the order of the Judges of the Eastern District of Virginia entered in each of the some 160 civil cases in the Eastern District of North Carolina which the five Judges in Virginia agreed to hear.

2. A motion in excess of three pages in length and a brief of some six pages sought to point out the reason for further discovery and change of place for holding the trial.

ters raised in our motions will facilitate the holding of a productive pre-trial in this case." Judge Hoffman in an order of February 14, 1969, directed that the motions be filed and set forth that the Court *"never* [italics by Judge Hoffman] suggested or ordered this case transferred to Norfolk, Virginia, for trial on May 23, 1969," and that there "was never any consideration or discussion of taking such action;" that the only reference to a hearing in Norfolk "was due to the fact that counsel were not prepared with respect to a final pre-trial conference order which should have been presented to the Court on January 29, 1969." [3]

On February 20, 1969, the Court heard argument on plaintiff's motion for (a) further discovery and (b) a verbal motion that day made to permit it to file what plaintiff referred to as P/T Exhibit 4. The reasons therefor are set out in that order and in the record.

Under the provisions of the Local Rules for the Eastern District of North Carolina,[4] all discovery must be completed "within four months after the case is at issue."[5] Judge Hemphill's order of February 19, 1968, fixing date for pretrial on April 9, 1968, set forth it was anticipated all discovery had been completed and required counsel justify failure to complete. By Judge Hemphill's order of April 9, 1968, time for discovery was extended for 30 days. No request was made for further extension, nor, following the entry of the order of December 9, 1968, fixing date of pretrial for January 29, 1969, did plaintiff seek an extension for discovery. It made such a request at the pre-trial conference of January 29, 1969. On that date counsel were advised the case was scheduled for trial for May 23, 1969. The parties had previously taken discovery of some twenty-five to thirty witnesses. There had been ample time for discovery. Plaintiff had not complied with the previous orders relative to discovery; if plaintiff was granted additional time, then the same right should be granted defendant. Such would probably bring about requests for additional exhibits, witnesses, probable amendments to the pleadings, further motions, interrogatories, and so on, and a probable request for a postponement of the date of trial.

The same applied to P/T Exhibit 4. Plaintiff had made no attempt to comply with any of the pre-trial orders. This Exhibit was described as a volume 8½ inches wide, 14 inches long, and 13½ inches high consisting of photocopies of various documents.

On February 20, 1969, the Court was advised plaintiff was listing some seventy-five persons to be called as witnesses, and defendant had likewise listed a considerable number.

Following the pre-trial conference of February 20, 1969, the Court on that day entered an order [with copies to counsel] (1) limiting the witnesses to a reasonable number[6] with plaintiff to file its list by February 28th, and defendant by March 10th, 1968; (2) directing plaintiff to file by March 15, 1969, an up-to-date statement of the provisions of the Civil Rights Act which it contended defendant "is now violating," with defendant to respond by April 10th as to whether any such listed violations had been in fact eliminated; (3) requiring plaintiff to list the witnesses it would call to establish "each violation it contends still exists" and the evidence each witness was expected to give, with defendant to file a similar list.

On March 3, plaintiff filed a list of witnesses containing 57 names, with the statement that plaintiff reserved the right "to submit the names of additional

---

3. The order of December 9, 1968, placed the responsibility upon plaintiff's counsel to prepare the order.

4. Rule 7, subd. E, U.S.D.C. for Eastern District of North Carolina.

5. Answer was filed by defendant May 31, 1967, and the parties were at issue.

6. Counsel for plaintiff stated in the record, "but I would guess that 15 or 20 witnesses at the outside is what we'd call."

witnesses;" on March 10, defendant filed its list of 47 witnesses, with the statement that when plaintiff filed its up-to-date statement of contentions, the list could be revised.

On March 17, plaintiff filed its "Issues of Fact" of some six and a fraction pages. Defendant objected, stating it did not comply with the pre-trial order of February 20th. By order of March 24, the Court rejected such statement and directed compliance with its previous order. Plaintiff was directed to specify the violations existing, the names of those discriminated against, the nature of the discrimination, etc. This order in eight numbered paragraphs called for the information which plaintiff had previously been directed to file. There could be no doubt plaintiff had had ample time to assemble this information. Defendant had previously requested this information by interrogatories. Instead of attempting to comply with the order of March 24th, and the previous orders, plaintiff on April 3 filed a "Summary of Expected Testimony" of its various witnesses, some forty in number. By order of April 10, the Court rejected such "summaries" and directed plaintiff to comply with the orders of February 20th and March 24th. Pursuant to a telephone call from plaintiff's counsel to the Court's Law Clerk, and a letter of April 11th, the Court on April 14th wrote such counsel that when the "specifics called for in the order of March 24th are filed, it appears to me the plaintiff will then be in compliance." The reason for ordering a strict compliance with the previous order was again made clear.

At the pre-trial conference of February 20th, it was stated the trial of this case would require a week or more. After a full discussion of the issues and the direction to furnish the facts called for by the pre-trial order, all counsel agreed the case could be disposed of in less than a day. Counsel were advised that the Court would only be sitting in Raleigh for the week of May 19th; that more than 36 cases were on schedule for that week, many of which were jury trials; and that the Court would have to conclude this case on May 23rd. With a compliance by all parties, it was understood the case could be disposed of in that time. Without regard for this admonition by the Court, plaintiff's counsel had summonses issued for a number of witnesses to appear on May 24th.

The above information is set out in detail for the purpose of showing the course of the proceedings and the difficulty which has been encountered in obtaining the cooperation of plaintiff's counsel in reaching a disposition of this case.

## THE CASE FACTS

In a statement filed April 15, 1969, of "present violations" plaintiff asserts defendant (1) makes initial assignments of employees on the basis of race without regard to qualifications, (2) makes racially discriminatory job assignments which result in less favorable conditions for Negroes than for Whites, (3) does not have a central hiring office which results in assignment of beginning employees on the basis of race, (4) discourages Negroes who attempt to transfer to traditionally White jobs, (5) does not offer Negroes the opportunity for advancement, and (6) has failed to take steps to correct past discrimination procedures. In support of these allegations plaintiff offered the testimony of twenty-two witnesses [twenty on direct and two in rebuttal] and the deposition of one. Defendant presented some ten witnesses.

With few exceptions, the evidence is undisputed. While different inferences may be drawn from some of the evidence, where these inferences arise, and when the evidence is in any conflict, we find no difficulty in resolving the conflict.

Defendant is, and has been for a number of years, engaged in selling, installing and servicing industrial equipment and supplies. It employs machinists,

welders, mechanics, painters, truck drivers, laborers, and various other personnel. Quite a number of the employees must be highly skilled. At the Raleigh plant as of October 18, 1967, there were 68 White and 20 Negro employees. It was stipulated that up to February 1966 [prior to the institution of this suit] there was a separate room at the plant used as a cafeteria for Negro employees. Such does not now exist. In fact, it should be pointed out that there are now no separate facilities for Negro and White employees.

Soon after passage of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., the basis of this action, officials of defendant company contacted each of its supervisory personnel and advised them of the provisions of the Act, held a meeting of the department heads, with their attorney present, and had such attorney explain the requirements of the Act. A memo was issued to the supervisors advising them of the provisions of the Act and that compliance with it was required. After plaintiff complained of supervisors and/or department heads being authorized to employ persons in their departments, the company directed that all applications for employment be channelled through one person, an officer of the company.[7]

The alleged violations asserted against the defendant are not substantiated by the believable evidence in any particular. There are White and Negro office workers, welders, machinists, mechanics, truck drivers, laborers, helpers, supervisors and so on. The Civil Rights Act of 1964 did not—nor did any other Act of Congress—require an employer to discharge all of its then employees and to commence a re-hiring. The evidence fails to establish a single instance where a Negro was denied employment or a transfer where there was a vacancy and the applicant met the qualifications.

Many of the Negro employees were, on their applications, transferred to other departments or positions. The supervisors in many instances suggested to Negro employees that they transfer to other positions. Nowhere in the record is there believable evidence where a supervisor or other person attempted to discourage Negroes from seeking to transfer to other positions or departments.

It was asserted by plaintiff that Negroes were required to take a test before they were employed as welders; that White persons were not required to take such a test; but if a White person was required to take a test, he was given a different test. The evidence—including the evidence presented by plaintiff—is without contradiction that the same test was given both to Negro and White; that the tests were generally given by the same two persons; and that a test was required of all applicants unless the supervisor had previous knowledge of the applicant's welding ability. The evidence points to no exception of this procedure.

The assertion that Negroes are not given the same opportunity to learn and advance is likewise not supported by the evidence. The evidence establishes that a class in welding and a class in blueprint reading[8] was given by the company. Any of the employees could attend without cost. Some of the Negro employees were asked to attend [John Henry Pope testified he was asked to attend]. A notice of the establishment of such a class was posted on the bulletin board of the company. At that class no Negro attended for more than one night. One Charlie Jones was given a welding test, which he failed. He was told by the supervisor that he would be permitted to make use of the company's equipment for practice and learning. Encouragement was given to the employees to make use of the company's equipment

7. While the plaintiff complains of the lack of a central hiring office, there is no requirement in the Act that such be maintained.

8. Many of the welders and machinists must be able to read blueprints.

and facilities for study and learning. Many of the skilled employees did learn by such use, and by working with other employees of the company.

Plaintiff complains that Negroes, with skills, are required to work in "cleaning up" and in loading or unloading trucks. This is true, but again the evidence is without contradiction that all of the skilled workers are required to do this. Each one is responsible to keep the space around his work area clean, both White and Negro. As one witness said, all mechanics help load and unload trucks. There are some persons who are janitors or who work with janitors. Some are Colored and some are White.

The contention that all persons who apply for employment should be told of any existing vacancy was best answered by one of the company officials when he was asked why he did not tell applicants of any vacancy which existed. He answered that he would look rather foolish to tell a person with secretarial qualifications applying for a position as a secretary that there was a vacancy for a welder or machinist. The same answer is applicable to one applying for a position as truck driver.

Plaintiff places much reliance on its contention some three Negroes were discriminated against. It says Charles Edward Jones was not promoted as quickly as he should have been. He was employed in the summer of 1962, entered the Armed Services in 1963, and returned in 1965. He was re-hired, although at that time the supervisor said they really had "no job for him." In a conversation with Jones, the supervisor, Stickeleather, told him he felt there was better chance for advancement at the "steel warehouse" and Jones was transferred. At his request he was given welding tests, which he failed. He took a third test before he qualified. He testified he was told he could use the company's equipment and facilities to practice welding. He was permitted to work with one of the expert welders for the company and now is permitted to operate most of the machinery and do welding. Plaintiff contended Paul Holden, a Negro who first did clean up and painting, and who now is in the fabrication section doing pipe threading, bolts, etc. and "making different things" should have been taught welding. Holden testified a free class in welding was given, but he did not attend, and the reason he did not weld "was because of his bad eyes;" that it hurt his eyes. He said he had never asked for a promotion, and had never complained of his treatment. For reasons which he explained, defendant had been good to him. John Henry Pope, a Negro, who was a truck driver before being employed by defendant, applied for and was given employment in the traffic department. Upon his application, he was transferred to the fabrication department. He took a course in welding, was given and passed the test. While in the fabrication department he learned to operate all the machines of that department, and is doing principally welding at this time. He was asked by his supervisor to attend the blueprint reading class, but it was not convenient for him to do so. The supervisor (a White person) made arrangements for him to attend a class nearer his home. Clyde O'Neal who had served in the Army, working on guns, was employed for a short time about 1967. He testified he was employed in the position he applied for, that he never asked for a promotion or transfer, and never made a complaint. The plaintiff says defendant did not use the capabilities or prior experience of this applicant.[9] And so the complaint and evidence went.

9. How his previous knowledge of guns could be utilized by Dillon Supply is not shown, unless we are to assume there is a connection between Marshal Matt Dillon of "Gunsmoke" and defendant, and that this party should have been assigned to work with Matt.

With all parties urged to follow the pre-trial procedure and knowing the evidence was to be heard in one day, it was apparent plaintiff's counsel were "dragging their feet" to prevent the trial from being concluded within the day.[10] After using the time from 9:00 o'clock a.m. to 3:30 p.m. to present evidence, and after presenting the evidence of some 20 witnesses, the Court advised counsel they would not be permitted to put on any more cumulative testimony. Plaintiff rested at about 3:45 to 4:00 o'clock. After a brief recess, defendant produced its ten witnesses, who were examined and cross-examined within something slightly over two hours. Plaintiff then presented rebuttal testimony of its witnesses and offered the testimony of a third, which was not permitted.

Plaintiff's counsel deliberately sought to delay the proceedings, to enable them to send out, find and bring in another witness. One of its means of delay was to offer evidence which was objectionable and then to take time to put in the record what such a witness would testify to. After two years to prepare the case, to interview witnesses, and to state what it expected to prove by such witness, there was no reason for such delaying tactics.

Plaintiff sought by subpoena duces tecum to present in evidence papers which they had failed to list as exhibits. When objected to, the Court would not permit their use. The suggested purpose was beyond any of plaintiff's previous contentions and particularly the contentions set out in the statement filed by plaintiff April 15, 1969. It was plainly an attempt to try to do indirectly what plaintiff had failed to do in response to the Court's order.

Not only has the plaintiff failed in its burden, but the evidence clearly establishes defendant is not in violation of the provisions of the Civil Rights Act of 1964. The action is therefore dismissed.

---

10. There were long pauses between questions and necessity for plaintiff's counsel to have conferences and discussions at counsel table after a few questions to each witness.